**F. L. SMIDTH & COMPANY**

**v.**

**UNITED STATES.**

**C.D. 3141; Protest Nos. 65/23165–85576.**

United States Customs Court,
Second Division.

Oct. 5, 1967.

Barnes, Richardson & Colburn, New York City, Joseph Schwartz and Hadley S. King, New York City, of counsel, for plaintiff.

Carl Eardley, Acting Asst. Atty. Gen. (Harold L. Grossman, Trial Atty.), New York City, for defendant.

Before RAO and FORD, Judges.

FORD, Judge:

This action is brought by protest duly filed against the action of the appropriate customs officials at the port of Los Angeles in classifying an importation of certain "steel tires," which are parts of rotary kilns used in the production of cement, under item 661.30 of the Tariff Schedules of the United States (TSUS) which provides as follows:

Industrial and laboratory furnaces and ovens, non-electric, and parts thereof ......................19% ad val.

Plaintiff, in its protest, made various claims but has limited its case to the claim that the imported articles are properly dutiable at the rate of 12.5 per centum ad valorem under item 661.70 which provides as follows:

> Industrial machinery, plant, and similar laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change of temperature, such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing, or cooling; instantaneous or storage water heaters, non-electrical; all the foregoing (except agricultural implements, sugar machinery, and machinery or equipment for the heat-treatment of textile yarns, fabrics, or made-up textile articles) and parts thereof:
>
> \* \* \* \* \* \* \* \*
>
> Other ..................................12.5% ad val.

The other claims not being urged are, therefore, deemed abandoned.

The record herein consists of the testimony of one witness called on behalf of plaintiff and six exhibits received on behalf of plaintiff. Plaintiff's exhibit 1 consists of a sketch of a typical rotary kiln while exhibits 2, 3, 4, and 5 are actual photographs of the rotary kiln upon which the tires in question were installed. Plaintiff's exhibit 6 is a brochure containing pictures and describing a typical rotary kiln.

Basically, the testimony adduced at the trial was to the effect that the imported steel tires are parts of a rotary kiln and were actually installed at the plant of Southwestern Portland Cement in Victorville, California. The steel tires involved weigh over 100,000 pounds each and the kiln without the imported steel tires weighs over 2,000,000 pounds. The kiln itself is used for the production of cement. The steel tires form part of the kiln and are necessary in order for the kiln to rotate. The kiln itself, while not involved herein, is described to be gas-fired. The rotation of the kiln is accomplished by means of a motor—in this instance a 700 horsepower electric motor —which provides its power to a gear rim and drive which consists of two speed reducers and two electric motors. The steel tires involved herein rest upon rollers to permit the rotation of the kiln. They are necessary because of the heavy weight of the kiln. The witness further explained that without the tires, the rotary kiln would collapse.

The evidence also indicates that, in addition to the driving motor, there are other electric motors used for fans for combustion and for blowing cool air through the "hot clinker" and that the cooler itself has a drive for moving the clinker through the cooler. The evidence also establishes that, in addition to the driving motor, an emergency gasoline engine is placed with the unit but used only in the event of an emergency to permit the kiln to rotate temporarily since an interruption during production would cause the kiln to become "crooked."

The witness also testified that the rotary kiln does not have any crucibles, retorts, fire beds, or shelves and that, in the operation, a chemical change of the materials fed into the kiln is caused by the heating, that there is a change of temperature in the kiln, and that said kiln accomplishes cooking, roasting, drying, and evaporating. In further explanation of this, the witness stated that cooking is drying out the $CO_2$, roasting is diffusing into the clinker the calcined material, and that drying is preheating of the material and the evaporation of moisture.

On cross-examination, a number of questions were directed to the witness relative to the question of substitution of other forms of power for the electric motors. The sum and substance of this testimony was to the effect that the substitution could be readily accomplished but would not be practical because it would require too large a gasoline engine. The balance of the testimony relates to the terminology and understanding of the terms furnace, oven, and kiln.

This is the first case submitted to this court involving item numbers 661.30 or 661.70 of the Tariff Schedules of the United States. Counsel for the respective parties, in well prepared briefs, have brought a number of issues to the attention of the court.

Basically, plaintiff contends that an electrically operated rotary kiln cannot fall within the purview of item 661.30 of said tariff schedules by virtue of the language "non-electric" contained in said item number. In addition thereto, plaintiff contends that a kiln is not a furnace or oven and, in any event, not the kind or class of items intended or contemplated to be covered by said item 661.30, supra.

Defendant on the other hand contends that the term "non-electric" contained in said item 661.30 refers to the source of heat rather than to some secondary or mechanical function of the kiln operated by electricity. It is also contended that a kiln falls within the common meaning of the terms furnaces and ovens.

■ The initial impression of the language "non-electric" contained in item 661.30, based upon "grammatical construction" and previous experience in customs litigation under the Tariff Act of 1930, would lead to the conclusion that the Government's position is untenable. However, the prime function of the court in interpreting the statutory language is to carry out the intent of Congress in enacting such legislation. In this instance by virtue of Public Law 768, 68 Stat. 1136, Congress delegated authority to the Tariff Commission to review the customs tariff schedules and improve procedures for tariff classification. The Tariff Commission, in following this mandate, did in fact prepare the present tariff schedules for final adoption by Congress. Said schedules were made effective by Presidential proclamation 3548. In its course of studies, the Tariff Commission, in addition to preparing the proposed tariff schedules, prepared a number of volumes entitled "Tariff Classification Study" which included a submitting report and 7 supplemental reports. In the submitting report at page 8, under the heading "Influence of other classification systems," said report states:

The first task which confronted the Commission in the preparation of the revised and consolidated tariff schedules was that of developing a logical, orderly, and systematic outline of provisions. To this end, a number of existing tariff, commodity, and industrial classification systems were carefully studied. Included among these systems were the "Nomenclature for the Classification of Goods in Customs Tariffs" (usually referred to as the "Brussels Nomenclature"), "Standard Industrial Classification Manual," "Standard International Trade Classifications," "Schedule A, Statistical Classification of Commodities Imported Into the United States," and "Schedule B, Statistical Classification of Domestic and Foreign Commodities Exported From the United States." As a result of such study, a tentative outline of proposed schedules was developed which evolved into the outline of the schedules reproduced at the end of this report. The proposed arrangement is not exactly like any of the above mentioned classification systems, but an effort was made to incorporate as many desirable features of each of them as possible. The "Brussels Nomenclature" and the "Standard Industrial Classification Manual" exerted the greatest influence on the arrangement of the proposed revised schedules.

■ It is elementary in the field of customs jurisprudence that the legislative history covering tariff provisions may, if ambiguity exists, be utilized by the court in order to ascertain the intent of Congress. In this instance, a reading of the complementary provision of item 661.30 in the Brussels Nomenclature reveals the Tariff Commission's reliance upon said publication. The language contained in said Brussels Nomenclature under item 84.14 recites the identical language included in said item 661.30 with the exception of the provision for parts thereof. The explanatory note in said Brussels Nomenclature indicates the fact that the merchandise intended to be covered by the term "non-electric" embraces those furnaces and ovens which produce heat by the combustion of fuel. Similarly, the explanatory note, schedule 6, part 4, page 262, of the Tariff Classification Study states that item 661.30 of said tariff schedules refers to ovens and furnaces designed for the production of heat by the combustion of fuel.

■■ Therefore, it becomes apparent that defendant's contention that the term "non-electric" refers only to the source of heat has merit. This is so since in both instances, the Brussels Nomenclature's explanatory notes refer to the combustion of fuel. Accordingly, it is clear that, in enacting item 661.30 and particularly in using the term "non-electric," the intent was to cover furnaces and ovens not electrically heated.

In further support of this position that the term "non-electric" contained in item 661.30 was intended to cover furnaces and ovens not electrically heated is the provision in the Tariff Schedules of the United States covering electrically heated ovens and furnaces and designated as items 683.90 and 683.95 which read as follows:

Industrial and laboratory electric furnaces and ovens; electric induction and dielectric heating equipment; electric welding, brazing, and soldering machines and apparatus and similar articles for cutting, and parts thereof:

Welding machines and apparatus, and parts thereof * * *

Other * * *

The explanatory notes covering said items 683.90 and 683.95, insofar as pertinent, state the following:

Items 683.90 and 683.95 provide for certain industrial and laboratory electro-thermic machines, apparatus, and appliances in which the heat is obtained electrically. * * *

Significantly, Brussels Nomenclature, under designation of item 85.11, provides as follows:

Industrial and laboratory electric furnaces and ovens; electric induction and dielectric heating equipment; electric welding, brazing and soldering machines and apparatus and similar electric machines and apparatus for cutting.

The heading showing what is intended to be covered by said item 85.11 reads as follows:

This heading covers a number of industrial electro-thermic machines, apparatus and appliances in which the heat is obtained electrically (e. g.: by the heating effect of a current in a conductor; from an electric arc; or by induction currents or dielectric hysteresis).

■■ It would, therefore, appear that a non-electric rotary kiln, that is to say, one not heated electrically, would fall within the purview of item 661.30 if it is a furnace or oven. Plaintiff contends that a kiln is never referred to as an oven or furnace which position is supported by the testimony of its witness. However, since this case is not one which involves a commercial designation, it is the function of this court to determine the common meaning of the terms furnace and oven based upon its own understanding of those terms. United States v. O. Brager-Larsen, 36 CCPA 1, C.A.D. 388. The court may resort to dictionaries and other written authorities to refresh its recollection of common meaning. United States v. Tropical Craft Corp., etc., 42 CCPA 223, C.A.D. 598.

A review of a number of dictionaries and other lexicographic sources indicates the following:

Webster's Third New International Dictionary Unabridged (1966):

> furnace, n. 1: an apparatus for the production or application of heat: as a: an enclosed structure for reducing ore or melting or heat-treating metal by the application of intense heat produced typically by full combustion * * * b: an oven for firing pottery: KILN

> oven, n. 1 obs: FURNACE

> kiln, n: an oven, furnace, or heated enclosure used for processing a substance by burning, firing, or drying: as * * * c: an oven with a heat-resistant lining used to fire ceramics.

Funk & Wagnalls New Standard Dictionary of the English Language (1956):

> Furnace, n. 1. A structure or apparatus containing a chamber for heating, fusing, hardening, etc., by means of a fire beneath, as for melting metal, baking pottery, evaporating water, etc. See list below. * * *

### PARTIAL LIST OF FURNACES

> Furnaces are named (1) from the service performed, use or business in which they are used: * * * (2) from some mechanical feature, arrangement, or characteristic; as * * * rotary * * *.

> oven, n. 1. A chamber in which substances are artificially heated for the purpose of baking, roasting, annealing, etc. Specif.: * * * (3) A kiln; * * *.

> Some ovens are named (1) from their use; * * * (2) from their construction or mechanism; as, * * * rotary * * *.

> kiln, n. An oven or furnace for baking, burning or drying industrial products. Specif.: (1) A furnace for calcining, as limestone. * * * (3) A furnace for vitrifying, as bricks or porcelain. * * *

> Kilns are named (1) from their form or mechanism; * * * (2) from some feature of their operation or arrangement, as, * * * rotary k. (a cylindrical kiln which revolves slowly and is so inclined as to permit the material fed at the top to drop out at the lower end), * * *.

Knight's American Mechanical Dictionary (1872):

> Kiln. A furnace for calcining; * * *.

> Or for baking articles of clay * * *.

> Or for vitrifying articles of clay, * * *.

> Furnace. A chamber in which fuel is burned for production of heat, which is directed upon an object in the vicinity, such as an ore or metal under treatment, * * *.

> Furnaces are distinguished by construction, by mode of operation, and by purpose. See under the following heads:—* * * Kiln. * * *

The Encyclopaedia Britannica (1947):

> FURNACE, METALLURGICAL. A contrivance in which metallurgical operations are carried out under the influence of heat derived either from the combustion of fuel or from the heating effect of the electric current. The temperature of the furnace may be high as in the case of the open-hearth furnace used in the manufacture of steel, or low, as in several types of calcining kilns, without affecting the accuracy of the definition.

> * * * * * *

> The classification of furnaces is very difficult, on account of the large number of forms in use and the looseness of the terms used in their description; perhaps the most satisfactory method is to arrange them, according to the manner in which the charge is heated, * * *.

> Shaft Furnaces.—It is necessary to subdivide these again into (a) kilns or natural draught furnaces and (b) blast or forced draught furnaces.

\* \* \* \* \* \*

Kilns.—These are used in cases where a high temperature is not necessary and where the products of the operation are not required in the molten state, as in lime burning and in the calcination of ores. Their forms vary according to the specific purpose of which they are to be used, \* \* \*.

 From a reading of the above authoritative publications, it would seem to us that the terms "furnace" and "oven" encompass kilns and hence that kilns come within the common meaning ascribed to said terms.

 It is an established principle of law with respect to the classification of such things as tools that the common nomenclature of various articles is not always reflected in dictionaries prepared for general use, and the court has often had recourse to more precise sources of information to ascertain the common meaning ascribed to such terms. Firth Sterling, Inc. v. United States, 48 CCPA 130, C.A.D. 779; United States v. The Spiegel Bros. Corp., 51 CCPA 69, C.A.D. 839. In view of the highly technical article involved herein, it is deemed wise to have recourse to two publications which have been conceded by plaintiff's witness to be recognized and accepted authorities in this field. The following information pertinent herein is contained in said sources.

Encyclopaedia of Chemical Technology, Kirk-Othmer (1951):

### FURNACES, FUEL-FIRED

\* \* \* \* \* \*

Roasting Furnaces and Kilns. \* \* \* These furnaces in the chemical industry may be either batch or continuous. \* \* \*

\* \* \* \* \* \*

For the continuous handling of bulk materials, *rotary kilns* are the most common method employed in the chemical industry. They are used for drying all kinds of products, for burning lime and dolomite, for sintering ores, for calcining, *for making portland cement,* and for many other processes. These kilns may vary in size from 12 in. in diameter and 3 ft. in length to 12 ft. in diameter and 500 ft. in length. They may be internally fired and lined with refractories or constructed of heat-resistant alloys without refractory lining and fired from the outside. [Emphasis supplied.]

Perry's Chemical Engineer's Handbook (1950):

### SECTION 23
### FURNACES AND KILNS

\* \* \* \* \* \*

### CLASSIFICATION OF FURNACES AND KILNS

\* \* \* \* \* \*

This section describes the commercial apparatus and structures used for the generation and application of high temperatures. \* \* \*

\* \* \* \* \* \*

1. According to Name. The terms "furnace" and "kiln" have a wide variance in their meaning as commonly used in different industries. The use of adjectives does not always clarify this situation, *e. g.*, a "lime kiln" may be a vertical shaft or a rotating cylinder slightly inclined from the horizontal position. Consequently care must be exercised in the use of these and other terms in this field.

In a strict sense, a *furnace* is a chamber made of a refractory material in which heat is generated at a high-temperature level, its design involving no consideration of the use of this heat. A *kiln* is an apparatus or chamber of a refractory material in which heat is used, but also it commonly includes the generation of the heat. \* \* \*

An *oven* is an apparatus or chamber of a refractory material in which heat is used at the lower levels of the high-temperature range, say below 1000°F. \* \* \*

\* \* \* \* \* \*

2. According to Use. Furnaces, kilns, etc., are often identified by their uses, such as cement kilns, lime kilns, gas producers, coke ovens, blast furnaces, glass tanks, zinc retorts, muri-

atic acid furnaces, sulphur burners, black ash kilns, and many others. All these units have different designs as specifically dictated by the physical and chemical properties of the charge being processed; consequently these are classified as *processing furnaces.* * * *

* * * * * *

6. According to Method of Heat Application. These include the *direct furnaces* and the *indirect heaters.* * * * The direct furnaces are brick-firing (and similar) tunnels and kilns, rotary kilns, blast furnaces, open hearths, reverberatory furnaces, shaft furnaces, Thermofor kilns, etc. * * *

7. According to Design or Shape. *Vertical furnaces* include cupolas, blast furnaces, shaft kilns, gas producers, pebble heaters, etc. *Horizontal furnaces* include tunnels, rotary kilns, ceramic kilns, heat-treating furnaces, etc. * * * *Space furnaces* include ore roasters, sulphur burners, rotary kilns, pipe stills, and steam boiler furnaces, particularly those fired with gaseous, liquid, or powdered fuels. * * *

* * * * * *

Ceramic Furnaces. The ceramic furnaces are generally called kilns * * *.

* * * * * *

## PROCESS FURNACES
### ROTARY KILNS

Uses of Rotary Kilns. One of the more important types of a process furnace is the rotary kiln, since it is probably more widely used in many different industries than any other single type. Many hundreds are used for the burning of cement, lime, dolomite, and magnesia products. Many others are used for dehydrating, roasting, or sintering materials such as bauxite, alumina, iron, chromite, and phosphate. Others are used for calcining lithopone and titanium pigments, for regenerating absorbents, for producing barium and sodium sulphides, for decomposing ferrous sulphate, and for defluorinating phos-

phate rock. The largest tonnage of materials now heated in rotary kilns is cement clinker. Formely limestone was calcined exclusively in shaft kilns, but many rotary kilns are now used for this service. * * *

* * * * * *

It is one of the few types of process furnace on which studies have been attempted from a chemical-engineering viewpoint. * * *

Consideration of the data contained in both the general dictionaries and the technical publications is sufficient in our opinion to establish that the common meanings of the terms oven and furnace encompass a rotary kiln. A further indication of the intent to include rotary cement ovens or kilns is the *eo nomine* enumeration of said article in the Explanatory Notes to the Brussels Nomenclature under item 84.14. While the explanatory notes of the Tariff Classification Study do not enumerate any articles intended to be covered under item 661.30, the reliance upon Brussels Nomenclature by the Tariff Commission and the use of the identical statutory language lead us to believe that the information contained in said explanatory notes to the Brussels Nomenclature expresses the intent to encompass said article within the purview of item 661.30. The imported tires, conceded to be parts of a rotary kiln, would, therefore, appear to fall within said item 661.30.

Ordinarily, in view of the foregoing, the court might conclude its determination at this point. However, as indicated, supra, this is the first decision of this court interpreting the new provision involved herein, and we deem it expedient to make the following observations. In reviewing the legislative history of the enactment of the Tariff Schedules of the United States, we find the following language included in Public Law 768, supra:

Sec. 101. (a) The United States Tariff Commission shall proceed promptly to make a complete study of all provisions of the customs laws of the United States under which imported articles may be classified for

tariff purposes, including the dutiable and free lists and related special provisions of the Tariff Act of 1930, as amended and as modified, the provisions of the Internal Revenue Code relating to the duties designated as import taxes, as amended and as modified, and other laws. The Commission shall compile a revision and consolidation of such provisions of the customs laws which, in the judgment of the Commission, will accomplish to the extent practicable the following purposes:

(1) Establish schedules of tariff classifications which will be logical in arrangement and terminology and adapted to the changes which have occurred since 1930 in the character and importance of articles produced in and imported into the United States and in the markets in which they are sold.

(2) Eliminate anomalies and illogical results in the classification of articles.

(3) Simplify the determination and application of tariff classifications.

(b) The Commission shall seek to accomplish the purposes of subsection (a) without suggesting changes in any rate or rates of duty on individual products, whether those rates are applied by statute or by Presidential proclamation. Where, however, in the judgment of the Commission, the purposes of subsection (a) cannot be accomplished without such changes, the Commission shall specify each incidental change in rates which in its judgment would accomplish such purposes, and shall accompany it with a summary of all the data on which such suggested change was based, together with a statement of the probable effect of such suggested change on any industry in the United States. Before suggesting any changes in rates of duty, the Commission shall give public notice of its intention to do so and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at public hearings with respect to the probable effect of such suggested changes on any industry in the United States.

As we interpret section 101(b), the Tariff Commission was to accomplish the purposes set forth in section 101(a) without suggesting any change in existing rate or rates and that any suggested change of rate required the Tariff Commission to:

1. Specify each change in rate;

2. Prepare a summary of all data upon which the change of rate was based;

3. Give a statement as to the effect on American industry; and

4. Before any change, public notice of the intent to change the rate must be given to afford a reasonable opportunity of interested persons to be heard.

An examination of the explanatory notes of the Tariff Classification Study covering item 661.30 reveals the following statement in apparent compliance with the above requirements of section 101(b):

* * * The furnaces and ovens in question are presently classifiable in paragraph 397 at the rate of 19 per centum ad valorem which is the rate proposed for item 661.30.

 While it is true that a kiln was not imported but merely parts thereof, it is, nevertheless, obvious from the description of the operation of the kiln and the photographic exhibits that such a kiln, if inported under the provisions of the Tariff Act of 1930 prior to the issuance of the amended Tariff Schedules of the United States, would have been classified under the provisions of paragraph 372 of said act or paragraph 353 of said act if, at the time of importation, it had as an essential feature an electrical element or device. The rates prescribed at the time of the effective date of the Tariff Schedules of the United States under either prior paragraph number were less than 19 per centum ad valorem. It is, therefore, apparent that the Tariff Commission did, in truth and

**394**

in fact, change the rate or rates of duty. Since the Tariff Commission made the foregoing statement in the explanatory notes indicating no change of rate, and there was no summary of data upon which a change of rate was based, it is fair for us to assume, in the light of a review of the numerous statements published in the various supplemental reports, that the Tariff Commission has failed to give the required notice of intent to change the rate as set forth in section 101(b). The only compliance with section 101(b) was a general blanket statement that, in the opinion of the Tariff Commission, there would be no effect on any American industry. It is, therefore, apparent that the Tariff Commission failed to comply with the provisions of Public Law 768, supra.

The Tariff Commission's failure to comply with the mandate of Congress in delegating the authority to revise the tariff act is tantamount to an *ultra vires* act on its part. However, subsequently Congress did adopt and ratify the proposed tariff schedules, Public Law 87–456, 76 Stat. 72. Therefore, while the action of the Tariff Commission was in its inception *ultra vires*, the subsequent adoption and ratification by Congress validated the tariff schedules. It is a basic principle in the field of statutory construction that Congress is deemed not to have performed a useless act. Hence, in adopting the schedule, with its clear purpose to draw rotary kilns of the instant variety within its scope, it is presumed that Congress was aware of the oversight on the part of the Tariff Commission and, nevertheless, ratified its action by adopting the tariff schedules.

Since the provision under which classification was made, item 661.30, is valid and since, as was indicated, supra, we are of the opinion that it was the intent to include said merchandise within the purview of item 661.30, we could readily conclude our opinion at this point. Plaintiff, however, contends that the provision relied upon, item 661.70, is more specific than item 661.30.

The principle of relative specificity is but a rule of construction employed by the courts in an effort to ascertain legislative intent. Like all rules of construction it must yield if the legislative intent is shown to be counter to the apparent intent indicated by such rule. United States v. Stone & Downer Company et al., 274 U.S. 225, 47 S.Ct. 616, 71 L.Ed. 1013. The prime function of a court is to interpret the statutes involved so as to carry out the legislative intent. L. R. Markell et al. v. United States, 16 Ct.Cust.Appls. 518, T.D. 43239. Procter & Gamble Manufacturing Co. v. United States, 19 CCPA 415, T.D. 45578.

Accordingly, even if we were to agree with plaintiff's contention that item 661.70 is more specific than item 661.30, and we do not so hold herein, this would not justify a finding that rotary kilns, of which the imported tires are parts, were intended to be covered by said item 661.70 since the legislative intent establishes to our satisfaction that the involved merchandise falls within the purview of item 661.30. The protest is, therefore, overruled.

Judgment will be entered accordingly.

RAO, Chief Judge, concurs.