(C.D. 3887)

GENERAL ELECTRIC COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided September 22, 1969)

Barnes, Richardson & Colburn (*E. Thomas Honey* of counsel) for the plaintiff. *William D. Ruckelshaus,* Assistant Attorney General (*Arthur E. Schwimmer* and *Owen J. Rader,* trial attorneys), for the defendant.

Ford, Judge: The above protests consolidated for the purpose of trial place in issue the classification of certain articles described on the invoices as earphones and other articles described thereon as earphone jacks. The former were classified as headphones pursuant to item 684.70 of the Tariff Schedules of the United States and assessed with duty at the rate of 15 per centum ad valorem while the latter were classified pursuant to item 685.90 providing for electrical apparatus for making or breaking electrical circuits and were assessed with duty at the rate of 17.5 per centum ad valorem. Plaintiff claims classification for both importations as other parts of radio reception apparatus pursuant to item 685.22 or as electrical articles and electrical parts of articles, not specially provided for pursuant to item 688.40.

A review of the official papers relating to protest 66/6211 indicates the date of liquidation to be on September 23, 1965, and the protest was filed on November 23, 1965. More than 60 days having elapsed, the protest is untimely pursuant to the provisions of section 514, Tariff Act of 1930. Said protest will accordingly be dismissed.

The relevant statutory provisions are as follows:

Classified under:

| | | |
|---|---|---|
| 684.70 | Microphones; loudspeakers; head phones; audio-frequency electric amplifiers; electric sound amplifier sets comprised of the foregoing components; and parts of the foregoing articles (including microphone stands) _____ | 15% ad val. |
| 685.90 | Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof _____ | 17.5% ad val. |

Claimed under:

| | | |
|---|---|---|
| | Radiotelegraphic * * *; radiobroadcasting * * * and reception apparatus, and parts thereof: | |
| | * * * * * * * | |
| 685.22 | Other _____ | 12.5% ad val. |
| 688.40 | Electrical articles, and electrical parts of articles, not specially provided for_____ | 11.5% ad val. |

Two witnesses testified for the plaintiff, Mr. Walter S. Yonker, the manager of materials, and Mr. William L. Ferrigno, Jr., the manager of product planning and market research at the radio receiver department of the General Electric Company. In the course of Mr. Yonker's testimony regarding earphones, a number of exhibits were introduced in evidence: plaintiff's exhibits 1 and 2 consisting of earphones representative of those imported; plaintiff's collective exhibits 1–A and 2–A consisting of the blueprint drawings for the respective earphones prepared by General Electric Company for the manufacturer; and plaintiff's exhibit 5 consisting of an article which plaintiff offers as representative of the genre "headphones" as distinct from "earphones."

Mr. Yonker testified that based on his experience in ordering components for radios, there was a distinction between the importations at issue, known as earphones and headphones; such distinction resting primarily on the fact that headphones, whether they consist of one or two earpieces, are designed to be supported by the user's head while the earphones are designed for insertion into the ear or support by the ear alone.

Mr. Ferrigno elaborated on the distinction between a headphone and an earphone stressing the former's greater size, its reliance on the support of the head, its greater fidelity in sound reproduction and its exclusion of ambient noise. He also noted that the insertion of headphones into an audio circuit generally did not cut off the regular speaker as was the case upon the insertion of an earphone. Based on his familiarity with the market involved, the witness stated that he had never seen articles such as those at issue offered for sale as headphones; nor had he seen articles such as those represented by plaintiff's exhibit 3 offered for sale as earphones.

He further testified that the articles in question were designed for use with specific General Electric radios and were sold and used only together with the radios or as replacement parts.

The issue in this case, with respect to the imported earphones is whether or not they fall within the common meaning of the statutory term "head phones." As is always the rule when common meaning is at issue, it is the province of this court to determine the meaning based on its evaluation of the available evidence and the weight of the authorities. It is by no means limited by the scope of the testimony or the thoroughness of the parties' presentations. In the end the court determines the common meaning of language based on its understanding and construction of disputed terms and resorts to dictionaries and other authorities. *United States* v. *Mercantil Distribuidora, S.A., Joseph H. Brown*, 43 CCPA 111, C.A.D. 617 (1956); *F. L. Smidth & Company* v. *United States*, 59 Cust. Ct. 276, C.D. 3141, 273 F. Supp. 384 (1967), affirmed in 56 CCPA 77, C.A.D. 958 (1969).

As a result of the study of authorities cited by the parties, the examination of additional authorities and a close examination of the statutory text, we conclude that the common meaning of the term "head phones" as it is used in item 684.70 of the Tariff Schedules of the United States does not extend to items known as earphones. The best available dictionaries appear to support this conclusion.

*Funk & Wagnalls New Standard Dictionary* (1956 ed.) :
  headphone n. *Elec.* A telephone-receiving set of earpieces connected by a metal band that rests on the head.

*Webster's New International Dictionary* (1957 ed.) :
  headphone n. (a) *Elec.* A telephone receiver held over the ear by a band worn on the head (b) *Radio.* A receiver like a telephone headphone for radio reception.

Defendant attempts to blur the distinction between headphones and earphones by pointing out that some definitions mention that headphones are "usually" attached by a band passing over the head thus implying that the absence of a headband, as in the importations, will still leave them classifiable as headphones. We do not agree with this analysis and consider that some means for support by the head is a distinguishing characteristic of headphones and that the use of the word "usually" in definitions is to be interpreted as indicating the normal and preferred form of embodiment. Defendant also cites a number of authorities which define the word earphone as headphone. However since we view these definitions of "headphone" in these very same dictionaries as requiring that headphones possess means for support by the head, we arrive only at the circular result that earphones must also have head supports. This result is plainly not useful to the inquiry herein.

The result of our study is that we understand headphones to be audio receiving units which are supported by the head and earphones to be such units suitable for insertion into the ear. This distinction is best set forth in *Webster's Third New International Dictionary* (1966) which defines terms in dispute as follows :

  headphone n :  an earphone held over the ear by a band worn on the head

  earphone n–s :  any device that converts electrical energy into sound waves and is worn over or inserted into the auditory opening

It would be unwise, however, to concentrate exclusively on the meaning of the word earphone. Had that been the word chosen for use in the statute then a thorough examination of its definition would have to be given precedence. However, since the statutory language involves the use of the term "head phones" it is the definitions of that

word which must control and even though there is an element of imprecision in the approach of some dictionaries we feel that the common meaning of the term which emerges from study is a device provided with means for support by the head.

We emphasize that this approach has not been based on narrow technical considerations which derive from the usage of a particular trade or scientific discipline. For this reason, we have not relied on testimony which appeared to be directed at establishing a commercial designation, nor have we relied heavily on definitions in technical sources. We simply conclude that the headphone listed in the statute is an audio listening device which is supported in position by the user's head.

Samples of the items in dispute which were invoiced as "jacks" were introduced in evidence as plaintiff's exhibits 4 and 5. Concerning them, Mr. Yonker testified that they were known as jacks and were purchased for use in radios produced by the General Electric Company and were manufactured pursuant to drawings supplied by General Electric Company to the manufacture. Mr. Ferrigno testified that the jacks such as those imported were used to convey electric signal information to the earphones and were not constructed for use in an electrical power circuit. He distinguished them from electrical switches, relays, fuses, lightning arresters, plugs, receptacles or other electrical apparatus for making or breaking electrical circuits on the ground that the latter articles were used in connection with electricity as a power source while the instant jacks dealt with electricity only in its nature as a carrier of signals or intelligence in an audio circuit. On cross-examination, he conceded that in a broad sense the jack completed a circuit within the radio and acted as a connector therein.

The testimony regarding the imported "jacks" establishes that they are the means whereby the audio signal is carried to the earphones when the latter are inserted in the radio circuit. They are not designed to carry the loads of electrical power associated with the use of electric light and electric motors but rather are designed for the handling and transmission of audio signals. The imported jacks are imported for use in radios made by the General Electric Company.

In the above respects the imported jacks are similar to the articles which were the subject of decision in *Midland International Corporation* v. *United States*, 62 Cust. Ct. 164, C.D. 3715, 295 F. Supp. 1101 (1969). In that case this court held that items enumerated in item 685.90 were intended for use in power circuits and did not cover items suitable for use only in low current audio circuits. Since the

instant jacks are designed and dedicated for use as parts of radios and are not suitable for uses in power circuits, they were erroneously classified.

In view of our conclusions regarding the original classification of the imported items the sole remaining question is whether plaintiff has proved the classification for which it contends namely, parts of radio reception apparatus. Since such is the case, we do not reach plaintiff's less specific claim for classification as electrical articles or electrical parts of articles. The testimony of plaintiff's witnesses establishes that the importation, both earphones and jacks, are designed for use in radios. The jacks are, at all times, essential to the functioning of the radio while the earphones are essential to use when attached. Both of these articles are parts, the jacks meet the more rigorous standards formerly applied such as those enunciated in *United States* v. *Willoughby Camera Stores, Inc.*, 21 CCPA 322, T.D. 46851 (1933), while both they and the earphones meet the more recent criteria expressed as follows in *Motorola, Inc., and International Expediters, Inc.* v. *United States*, 54 Cust. Ct. 303, Abstract 69019 (1965) :

> The appellate court, in *Gallagher & Ascher, supra*, in reviewing the *Pompeo* and *Trans Atlantic* cases, *supra*, for the purpose of distinguishing the *Willoughby* case, *supra*, concluded that where an article is dedicated to a sole specific use and is necessary for the efficient operation of the article to which it is dedicated when once attached, it becomes a part of said article.

> In the instant case, the earphones are exclusively designed for use in portable radios and when attached to the said portable radio, the speaker being automatically disconnected, the earphones, in the performance of the function for which they are designed, become a part of the radio.

The testimony herein further indicates that the use of the importations herein as parts of radios constitutes their chief use and hence their classification as parts of radio reception apparatus is in conformity with the requirement of General Interpretative Rule 10(ij) that a "part" of a specific article under the Tariff Schedules of the United States must be solely or chiefly used as a part of that article and is not specifically enumerated elsewhere.

Accordingly, based on the above, we conclude that both the imported earphones and jacks are properly classifiable as other parts of radio reception apparatus and are properly dutiable at the rate of 12.5 per centum ad valorem.

Judgment will be entered accordingly.