**REMBRANDT ELECTRONICS, INC.**

v.

**UNITED STATES.**

C.D. 4613; Court No. 67183657–48049.

United States Customs Court.

Oct. 16, 1975.

Shaw & Stedina, New York City (Charles P. Deem, New York City, of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen. (John A. Gussow, New York City, trial atty.), for defendant.

FORD, Judge:

This case involves the proper classification of certain articles described on the commercial invoices as "Television Antenna Switch unwired with Nut" which were classified as electrical switches under the provision of item 685.90, Tariff Schedules of the United States, and assessed with duty at the rate of 17.5 per centum ad valorem. Plaintiff contends the merchandise, a patented device for use in a television antenna, is properly subject to classification as parts of television reception apparatus under item 685.20, Tariff Schedules of the United States, and as such subject to duty at 10 per centum ad valorem.

Defendant concedes in its brief that the imported merchandise is used exclusively in television antennas but contends the provision for electrical switches more definitely describes the article and therefore must prevail over a "parts" provision by virtue of General Interpretative Rule 10(ij) of the Tariff Schedules of the United States. Plaintiff on the other hand takes the position that the law is well settled that the articles set forth in item 685.90, *supra,* cover only articles used for electrical power sources and not those utilized in audio or television circuits. *Midland International Corporation v. United States,* 62 Cust.Ct. 164, C.D. 3715, 295 F.Supp. 1101 (1969); *General Electric Company v. United States,* 63 Cust.Ct. 140, C.D. 3887

(1969), aff'd, C.A.D. 1021, 441 F.2d 1186, 58 CCPA 152 (1971).

The pertinent statutory provisions read as follows:

Item 685.90, TSUS:

Electrical switches, relays, fuses, lightning arresters, plugs, receptacles, lamp sockets, terminals, terminal strips, junction boxes and other electrical apparatus for making or breaking electrical circuits, for the protection of electrical circuits, or for making connections to or in electrical circuits; switchboards (except telephone switchboards) and control panels; all the foregoing and parts thereof .............. 17.5% ad val.

Item 685.20, TSUS:

Radiotelegraphic and radiotelephonic transmission and reception apparatus; radiobroadcasting and television transmission and reception apparatus, and television cameras; record players, phonographs, tape recorders, dictation recording and transcribing machines, record changers, and tone arms; all of the foregoing, and any combination thereof, whether or not incorporating clocks or other timing apparatus, and parts thereof:

* * * * *

Radiotelegraphic and radiotelephonic transmission and reception apparatus; radiobroadcasting and television transmission and reception apparatus, and parts thereof:
Television apparatus, and parts thereof ................ 10% ad val.

10. *General Interpretative Rules.* For the purposes of these schedules—

* * * * *

(ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

The record presented on behalf of plaintiff consists of the testimony of three witnesses and the introduction into evidence of 10 exhibits. Defendant offered the testimony of one witness and one exhibit was received on its behalf.

The first witness called on behalf of plaintiff was Mr. William T. Korn, president of Rembrandt Electronics, Inc. and All Channel Products. Rembrandt was the purchaser of the raw material and manufactured the antenna which was sold by All Channel Products until approximately two years ago. At present, All Channel Products does the purchasing and selling. The witness was familiar with the imported antenna switches and testified that prior to importing them and at present the switches were manufactured and purchased from Centralab in the United States.

The switches, affording to witness Korn, whether imported or made by Centralab were manufactured pursuant to the patent of Marvin P. Middlemark who was paid royalties. There is only one type of antenna switch involved although some were imported with wires and others without.

Mr. Marvin P. Middlemark, inventor of the antenna of which the switch is an integral part, is presently chairman of the board of All Channel Products. The witness identified exhibit 1 as the switching arrangement of the antenna. The switching arrangement is utilized to combine different combinations for the antenna to enable it to eliminate ghosts or bring in television signals from different directions. The witness testified that the transcript of the examination before trial which was received in evidence as plaintiff's exhibit 7 is accurate.

On cross-examination, Mr. Middlemark testified he was not an engineer but has an engineering background. He admitted the imported article is a switch but would not agree that it was an electrical switch. According to the witness, the switch merely connects different elements of the antenna. The wires connected to the switch carry high frequency induced voltages which are picked up by the antenna. After having examined exhibit 2, the witness was of the opinion that it appeared to be the same as plaintiff's exhibit 1. Mr. Middlemark testified that in his opinion an electrical switch is one in which power is carried. The switch, in his opinion, is not an electrical switch notwithstanding the reference in his patent to the terms "electrical connection," "electrically connected"

and "electrically connecting." The term "electric" according to witness Middlemark is a very broad term.

Next called on behalf of plaintiff was Mr. William L. Fowler, vice president of marketing for Centralab Electronics, the American manufacturer of the switch used in the Rembrandt antenna. Mr. Fowler has a B.A. in physics, master of business administration and a master of science and engineering with an electronics major. Prior to his association with Centralab, which is among the top three manufacturers of switches in the United States, he was employed by Texas Instrument, Inc. for 11 years in various positions including manager of applications engineering and manager of the radio-TV design group. His duties during his employment included among other things application of switches.

Plaintiff's collective exhibit 8 is the design submitted by All Channel for the manufacture of a switch. Centralab has been making and supplying this switch to All Channel since 1958. A sample of the switch manufactured by Centralab pursuant to the specifications contained in plaintiff's collective exhibit 8, was received in evidence as plaintiff's exhibit 9. On *voir dire,* Mr. Fowler stated that the switch, plaintiff's exhibit 9, is covered by a patent held by Mr. Middlemark. According to Mr. Fowler, exhibit 9 is not a general purpose switch but is a custom-made switch designed primarily for interconnections of audio- and radio-frequency components.

Upon being shown exhibit 4, a single gang rotary switch manufactured by Mallory, Mr. Fowler testified that exhibit 4 is a general purpose switch and could not be substituted by All Channel in the manufacture of its antennas. Based upon his experience the witness testified that rotary switches have in excess of 15,000 uses but the involved switch, in his opinion, would not be applicable to any such uses. In the switch industry, the terms "shorting" and "non-shorting" have a particular meaning. A shorting switch is one in which a second contact is made before breaking the first

engaged contact. A non-shorting switch is one in which the first engaged contact is broken before the second contact is made. Shorting in an electrical sense as opposed to an electronic sense differs. In the former it means you have grounded the power and it would endanger the person operating the equipment or the equipment itself. In an electronic sense, shorting means interconnecting. Shorting switches are used in audio and RF (radio-frequency) applications in order to avoid sudden disruptions in the circuit whereas non-shorting switches are used in power circuits such as electric lights and motors. In addition to the shorting feature of the switch, the witness stated that the detent action, which relates to how rapidly the connections are made and broken, the material of the stator, and the contact materials make the involved switch unsuitable for power applications.

According to witness Fowler, the detent action in power application requires the rapid making and breaking of contact in order to avoid arcing at the contact point.

On cross-examination, Mr. Fowler testified he endorses the standards of the American Institute of Electrical Engineers and therefore agrees that a switch is a device for making, breaking, or changing the connections in an electric circuit. However, according to Mr. Fowler, a switch is a broad term. Exhibit 9 is composed of standard stock items carried by Centralab but manufactured to All Channels specifications. The witness then admitted that dipoles of the antenna intercept electromagnetic radiation which induces a voltage and current.

Mr. Fowler stated, in answer to questions by the court, that a low-power switch is one associated with RF (radio-frequency) and audio circuits as opposed to lighting, power and motor applications. Exhibit 1 is a low-power switch.

Defendant called Mr. Lee Stuart, an electrical engineer with the United States Army Corps of Engineers, on its

behalf. Mr. Stuart is a licensed professional electrical engineer having 16 years experience with the Corps of Engineers. The witness stated he signed an affidavit submitted for use in opposition to a motion for summary judgment and that the answers are true and correct. Counsel for defendant then offered said affidavit as defendant's exhibit B. Exhibit 1, according to witness Stuart, is a several position selection switch having a very small power rating. Exhibit 1 is not an electronic switch since it has no tubes, transistors or non-linear parameters. It is an electrical switch since it is used to connect components of the antenna for the strongest possible signal. This, in his opinion, is an electrical function.

The issue thus presented to the court is whether the imported patented switches, which are admittedly used exclusively in a television antenna produced by plaintiff, are electrical switches within the intendment of item 685.90, Tariff Schedules of the United States. If so, the term "electrical switches" being a specific provision would prevail over a "parts" provision as prescribed by rule 10(ij), *supra.* If, on the other hand, the articles enumerated in item 685.90, Tariff Schedules of the United States, relate only to articles used in power circuits, plaintiff must prevail as it has met the dual burden of establishing the classification to be incorrect and its contended classification to be correct.

The scope of item 685.90, Tariff Schedules of the United States, has previously been construed by this court and the Court of Customs and Patent Appeals. *Midland International Corporation v. United States,* 62 Cust.Ct. 164, C.D. 3715, 295 F.Supp. 1101 (1969); *General Electric Company v. United States,* 63 Cust.Ct. 140, C.D. 3887 (1969), *aff'd,* C.A.D. 1021, 441 F.2d 1186, 58 CCPA 152 (1971). These cases held the articles enumerated and described in item 685.90, *supra,* all relate to electrical power circuits. The Court of Customs and Patent Appeals in C.A.D. 1021 made the following observation:

Appellant argues that, since item 685.90 contains no express words limiting the application of the enumerated devices to "power" electrical circuits as distinguished from "audio" circuits, it was error for the court below to so construe the statute. In aid of this contention, appellant relies on dictionary definitions and certain encyclopedic, scientific and technological commentaries as well as the 1955 *Brussels Nomenclature* and explanatory notes relating thereto.

After a consideration of the language of item 685.90, the background materials cited in aid of construction of that item, and the arguments of counsel, we are not persuaded of reversible error in the decision of the Customs Court. We cannot agree with appellant's argument that rule 10(ij) requires that the provision of item 685.90 for "other electrical apparatus for making or breaking electrical circuits" must prevail over the provision for parts of radio reception apparatus in item 685.22. This is because we think the Customs Court was correct in its holding that the imported jacks, used in low current audio circuits, are not specifically provided for in item 685.90 since the items enumerated therein all relate to electrical power circuits.

I am not unmindful that the jacks involved in these cases were classified under the provision for "other electrical apparatus for making or breaking electrical circuits * * *" and not the provision for "electrical switches" as is the classification herein. However, the entire item (685.90) has been held to relate to electrical power applications.

[1] The switches herein have been established by competent testimony to be utilized in the antenna portion which picks up the transmitted television signal. Such application is not a power circuit and hence the involved switch is not the type intended to be covered by said item 685.90, *supra.* Along this line, the court in C.A.D. 1021 made the following observation:

We also think it pertinent to observe here that a seemingly broad descrip-

tive tariff term is not to be taken as encompassing every article which may literally come within that term but rather only those articles of the type intended by Congress in enacting the TSUS. *United States v. Andrew Fisher Cycle Co.,* 426 F.2d 1308, 57 CCPA 102, C.A.D. 986 (1970). The jacks in the present case are not, in out opinion, the type of article Congress intended to encompass by item 685.90.

Inasmuch as said articles are not switches within the scope of item 685.90, *supra,* they are consequently not governed by rule 10(ij), *supra.*

In view of the foregoing the claim of plaintiff under item 685.20, Tariff Schedules of the United States, *supra,* is sustained.

Judgment will be entered accordingly.